Booth, Judge,
delivered the opinion of the court:
This is a Dent Act ease. The plaintiff predicates his right of recovery upon an informal contract. The plaintiff was engaged in the manufacture of machine tools. His plant was located in the city of Chicago and was prior to the time of the transaction here involved sufficient in size to care for his enterprise, but wholly insufficient to carry on the contract work which the Government desired. What he now claims, and the damages he insists he is entitled to recover, arose in the following manner: On May 16, 1918, a general convention of the National Machine Tool Association was held at Atlantic City, N. J. The plaintiff, as a member of the association, attended this convention. Lieutenant Colonel Tripp, representing the Bureau of Ordnance, in an address to the convention, appealed to the members of the association to cooperate with and come to the assistance of the Government in the matter of machine tools. The situation was depicted by the officer as extremely critical and the necessity acute and vital. The plaintiff came to Washington from the convention and immediately got in touch with the Bureau of Ordnance. Maj.’ Charles D. Westcott, to whom he was introduced, was singled out for him as the officer in charge of the machine tools program. Major Westcott turned him over to Mr. Howard Abbott, said to have been associated with the major in the matter, and thereafter most of plaintiff’s dealings were with Mr. Abbott. Major Westcott and Mr. Abbott disclosed to the plaintiff the urgent needs of the department, going into detail, and sought from the plaintiff information of his present ability to contract for some portion of the contemplated machinery. It was finally agreed between them that the plaintiff’s knowledge of lathes and their manufacture best fitted him for an undertaking to manufacture the same. The plaintiff, however, assured the officers that his present plant facilities were decidedly inadequate to in anywise take on and complete the manufacture of the lathes decided upon, and that his only hope of being of any real' assistance was to secure additional plant facilities. He informed the officers that there was a vacant building, formerly used as a manufacturing plant by the Allis-Chakners Company, which *541 lie might secure, rehabilitate, and thus procure the needed facilities for manufacturing a substantial number of lathes. This situation appealed strongly to the officials, and they promptly urged the plaintiff to carry it forward, promising him at the time that if he did so he should have contracts, the consideration for which would be fixed at a price sufficient to absorb the cost of the rehabilitation of the acquired plant, discussing at the time the supplying of forty-three 42-inch lathes, and assuring him a contract for the same, a contract which would have practically absorbed the cost of rehabilitation, as a matter of fact going into detail respecting this contract and formulating the plans and specifications therefor, which the plaintiff thereafter prepared and submitted. Following a number of conferences concerning the matter, the plaintiff returned to Chicago, and on May 29, 1918, purchased the Allis-Chalmers plant, paying therefor $155,000, and with exceeding diligence and promptness rehabilitated the same at a cost of $58,810.52. On July 15, 1918, within two months after his visit to Washington, the plaintiff notified the department that he was equipped and ready to take over the contracts mentioned to him in his first conferences. In August, 1918, Mr. Abbott personally inspected the new plant and gave it his approval. The Ordnance Bureau gave the plaintiff one contract, and one only, for the manufacture of three 60-inch Fifield lathes at $20,000 each, and, despite their repeated promises and assurances to the contrary, the plaintiff received no other orders or contracts for work. The armistice precluded the contemplated activities of the department and the plaintiff’s single contract wras cancelled long before the time for completion. This suit is for the recovery of the amount expended in rehabilitating the old Allis-Chalmers plant, $58,810.52; $17,671.56 overhead expenses incurred in the rehabilitation of said plant; $5,000 for engineering services in preparation of the plans and specifications ^or the contract alleged to have been made for the manufacture of forty-three 42-inch lathes, and $10,977.38 for the materials purchased to perform the same, totaling a claim for $92,459.46.
The kaleidoscopic changes and reorganization of the Ordnance Bureau going on at the time plaintiff conducted *542 his transaction precludes a recovery in this case. There can be no doubt but what the plaintiff was positively assured the contract for which he contends; nor that he made the purchase of the new plant on the faith of such assurance. As a matter of fact, he refrained from taking on other and profitable work for the Navy Department because of this fact. The record discloses that just prior to plaintiff’s dealings with the department, the Chief of Ordnance operated the department upon a plan known as the commodity organization, i. e., bureaus were established for the procurement of the necessary ordnance supplies, and each bureau was empowered with plenary authority to contract for and purchase the particular commodity within its jurisdiction. A change in the office of the Chief of Ordnance brought about a complete reversal of the organization, and instead of the commodity plan, a new and novel organization predicated upon an organization known as functional divisions was adopted, bo far as this case is concerned, we need only mention that in pursuance of this organization a procurement and production division was established. In the production division a plant section ivas set up, and this section was charged with surveying the general conditions as to plant facilities throughout the country and encouraging the devotion of such facilities to war production, as well as soliciting enlargement of the same to meet the needs of the department. The officials with whom the plaintiff dealt, with the exception of Major Westcott, whose status seems never to have been exactly fixed, were officials of the plant section of the production division, and beyond doubt, under this organization, such officials were without authority to contract for or purchase ordnance supplies. This particular function was reposed in the contract section of the procurement division. The plaintiff, it is true, was never advised by anyone of this fact, and in this connection it is proper here to observe that within a very short time after his transaction with the department the functional organization was abandoned and the former commodity plan readopted.
In the case of Rock Island R. R. Co. v. United States, 254 U. S. 141, 143, the Supreme Court used this language: “Men must turn square corners when they deal with the *543 Government. If it attaches purely formal conditions to its consent to be sued, those conditions must be complied with.” The Dent Act, 40 Stat. 1212, extending a forum and relief to contractors who, during the war, entered into so-called informal agreements, i. e., contracts not in writing, as required by section 3144, Revised Statutes, has not been construed to include an agreement, no matter how positive, if the officer making the same was without authority to act. We would have no jurisdiction to adjudicate if the facts and circumstance of the case disclose a situation from which a contract may not be implied, even though the authority to contract existed.
This case falls squarely within the decision of the Supreme Court in Baltimore & Ohio R. R. v. United States, 261 U. S. 592, and the plaintiff may not recover. There was, so far as the decided cases indicate, no relaxation of the statutory requirement as to written agreements under sec. 3744, Rev. Stats., relating to contracts with the War Department because of the war. Erie Coal & Coke Corp. v. United States, 266 U. S. 518. The Dent Act afforded a remedy where the contract, did not meet the statute, but it did not by its terms dispense with the necessityof a contract. However misleading, and notwithstanding the confidence with which assurances were given and accepted, it is manifest that the same, including negotiations, afford no substantial grounds for inferring a meeting of the minds and implying contractual obligations. The findings clearly disclose that a contract between the parties herein was dependent upon the carrying forward of a contemplated plan which involved the procurement of the lathes. The whole transaction was contingent; it had not been definitely decided upon, and despite the lack of authority to contract, we would be unable to render judgment upon the record, if authority obtained.
The defendant contends for a judgment of $26,647.85, with interest, against the plaintiff on a counterclaim duly plead. The facts in the record upon this issue disclose an amazing situation, decidedly anomalous, and obviously without merit. After the close of the war the Bureau of Ordnance sought to dispose of vast quantities of surplus material, a considerable portion of the same being lathes, machinery of a *544 character the plaintiff dealt in. On April 1, 7, and 23, 1920, the plaintiff purchased from the Chicago Salvage Ordnance Board certain second-hand lathes, at the time making the advance payments required. This machinery the plaintiff contemplated overhauling and disposing of in a short time. Indeed, some of it had been sold by contract. Despite the persistent, repeated, and expensive efforts of the plaintiff to procure delivery of his purchase (he even going to the expense of sending his own trucks for the machinery), he could not obtain the same. The Chicago Ordnance Salvage Board was in a state of almost inextricable confusion. It was functioning abnormally, so much so, as will appear hereafter, that it required the heroic efforts of the officials at Washington to bring order out of chaos. In any event, the officials in charge ignored the plaintiff’s repeated requests for the delivery of the machinery involved, and finally, after the plaintiff had practically abandoned all efforts to procure the latter, and his customers had been lost, the officials of the Salvage Board in Chicago delivered at one time the whole purchase the latter part of August and the first of September. There was no market for the sale of the same, and the demand for the payment of this and the St. Louis lot was too great for the plaintiff’s financial resources; he could not meet it. Again, on March 25, April 13, and May 29, 1920, the plaintiff agreed to purchase from the St. Louis Ordnance Salvage Board certain machinery upon which he at the time made the requisite advance payments. A portion of this purchase ivas covered by a written contract between the plaintiff and Col. Hawkins, contracting officer of the Ordnance Bureau. This entire St. Louis purchase was finally rushed to the plaintiff’s plant about the same time as the Chicago purchase, in forty separate freight cars, over the protest of the plaintiff, and remained aboard the cars for some days, the plaintiff declining to accept it, and fully acknowledging his financial inability to pay for it, if he did, until finally the official of the United States designated for the purpose exacted from the plaintiff the signed agreement set out in Finding XIII. Manifestly, no such wholesale delivery of the articles purchased was ever within the contemplation of the parties to the contract of sale. *545 This is clearly expressed in the terms of the only written contract in existence. The case would fall within the decision of the Supreme Court in Erie Coal & Coke Corp. v. United States, supra, unless delivery might alter the situation. Without acceptance, delivery alone is seemingly insufficient. Aside from this, however, as between the parties, the agreement exacted from the plaintiff by the special officer dispatched under orders from the Washington bureau to proceed to Chicago and take charge of the Chicago Salvage Board, collect outstanding indebtedness, and clean up the prevailing .confusion is an express cancellation and rescission of the contract of sale and vested title to the articles sold in the defendant. It was so intended by the parties and was and is treated as such. It was executed at a time when the purchase price was unpaid and had been demanded, and the express purpose of its execution was to save the Government harmless from the impending and contemplated bankruptcy of the plaintiff. We see no objection to the agreement as between the parties to the contract of sale. It is quite elementary that the failure of the buyer to pay at the time agreed upon, and the seller notifies him that payment is due, and the buyer thereafter refuses to pay, that the contract of sale may be rescinded by the seller and the property resold.
It is certainly far from the manifestation of an acute appreciation cef justice to- predicate a claim for a most substantial amount upon the repudiation of an express agreement exacted by the Government from one of its citizens whose patriotic exertions to assist in time of war results so unfortunately. Courts never fail to hold the contractor to the terms of his agreement in his relationship to the Government, and no authority has been cited authorizing a different rule respecting express covenants of the United States. The property involved is the property of the United States and not the plaintiff’s.
The counterclaim of defendant will be dismissed. The plaintiff’s petition will also be dismissed. It is so ordered.
Geaham, Judge; Hat, Judge; DowNey, Judge; and Campbell, Ohief Justice, concur.